# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

May 9, 2019

Lyle W. Cayce
Clerk

No. 18-30241

CLAIMANT ID 100222322,

Requesting Party - Appellant

v.

BP EXPLORATION & PRODUCTION, INCORPORATED; BP AMERICA
PRODUCTION COMPANY; BP, P.L.C.,

Objecting Parties - Appellees

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:18-CV-37

Before HIGGINBOTHAM, JONES, and COSTA, Circuit Judges.

PER CURIAM:*

Claimant, Michael Dattoli, PLC, seeks compensation under the *Deepwater Horizon* court-supervised settlement program. It has been rebuffed at each step of the claim process because it cannot show that it was in existence more than eighteen months before the oil spill—leading the Claims Administrator to classify its claim as a Start-Up Business claim. The district

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

court granted discretionary review and agreed that the claim was properly addressed through the Settlement's Start-Up Business program. Finding no error in the district court's decision, we affirm.

## I

Sarasota Health Group LLC was a medical practice founded in 2000. It was owned by two medical doctors, Dr. Michael Dattoli and Dr. Richard Sorace, and one lawyer, Donald Kaltenbach. Beginning in 2006, SHG began operating under the name "Dattoli Cancer Center and Brachytherapy Institute."

In March of 2009, following a dispute between the owners, Claimant "Michael Dattoli, PLC"—solely owned by Dr. Dattoli—purchased all of SHG's assets through an asset purchase agreement.[1] Claimant ultimately operated a business in the same location and with the same employees, patients, services, and operating name as SHG. SHG continued to exist, as well. At a minimum, SHG continued to collect old accounts receivable; there is also evidence that it had over $100,000 in assets as of 2012, a $400 decrease from 2011. The parties disagree as to whether Claimant also assumed all of SHG's liabilities through the asset purchase agreement, or whether it only assumed certain liabilities specified in the agreement.[2]

In June 2013, Claimant filed a Business Economic Loss claim with the court-supervised settlement program. The Claims Administrator ultimately reclassified the claim to fall under the Start-Up Business Economic Loss program, which applies to claimants "with less than eighteen months of

---

[1] Shortly before this time, Dr. Sorace sold his shares of ownership in SHG to Dr. Dattoli, such that SHG was owned by Dattoli and Kaltenbach at the time of the sale.

[2] The asset purchase agreement provided for Claimant to assume liabilities "to include accounts payable from the normal operation of the business, the equipment lease with Synovus Bank and the employment agreement with Richard A. Sorace, MD . . . free and clear of any and all other liabilities, accrued or contingent." Claimant argues, however, that this in fact encompassed all of SHG's liabilities. As we will explain, the resolution of this disagreement ultimately does not affect our decision.

operating history at the time of the [spill]." The parties agree that the Start-Up Business Economic Loss program applies a more stringent causation test than the standard Business Economic Loss program. Applying this more stringent standard, and excluding SHG's financial information, the Claims Administrator denied the claim for failure to demonstrate causation.[3] The Appeal Panel reached the same conclusion.

The district court granted discretionary review and affirmed the Appeal Panel, concluding that although SHG operated an oncology practice at the same location and with the same staff as Claimant's current practice, "those two legal entities have differing ownership makeups, and further, the respective owners have no familial relationship." Therefore, "[u]nder these circumstances, the Settlement Program was correct to decline to use the financials of the prior legal entity when evaluating the claim of the later legal entity." Claimant brought this appeal.

## II

When reviewing the district court's denial of discretionary review for abuse of discretion, "the standard of review is effectively de novo . . . [when] the district court was presented with purely legal questions of contract interpretation."[4] We have recently held that interpretive issues are similarly reviewed de novo when the district court granted discretionary review and affirmed the Appeal Panel.[5]

We have not yet resolved what standard of review applies to the district court's *factual* determinations when the district court grants discretionary

---

[3] The Claims Administrator also denied re-review and reconsideration.

[4] *See In re Deepwater Horizon*, 785 F.3d 1003, 1011 (5th Cir. 2015).

[5] *See Claimant ID 100081155 v. BP Expl. & Pod., Inc.*, 920 F.3d 925, 928 (5th Cir. 2019).

review and addresses the merits of a claim.[6] Ultimately, we need not decide this issue here, because this case does not hinge on factual findings made by the district court.[7] The only point of genuine factual contention between the parties on this appeal appears to be whether the asset purchase agreement transferred all or only some liabilities to Claimant from SHG. Even taking the facts as Claimant has presented them—that the asset purchase agreement involved a complete transfer of liabilities from SHG to Claimant, in addition to a complete transfer of assets—there was no error in classifying the claim as a Start-Up Business claim.

## III

Claimant does not argue on appeal that the Claims Administrator misapplied the causation requirement under the Start-Up framework. The sole issue is whether the district court erred in holding that the claim was properly classified as a Start-Up Business claim. It did not.

## A

Two of our previous court-supervised settlement cases guide us in this inquiry. While both opinions were unpublished and therefore nonprecedential, we agree with their reasoning and conclude that the district court did not err in concluding that the Start-Up Business Program framework applied to Claimant.

In *BP Exploration & Production, Inc. v. Claimant ID 100169608* (*Adams Produce*), a food distributor, Adams Produce Company, Inc., approved a liquidation plan and reached an asset transfer agreement with a separate entity, Adams Produce Company, LLC, *after* the Deepwater Horizon spill.[8] The

---

[6] *See BP Expl. & Prod., Inc. v. Claimant ID 100169608* (*Adams Produce*), 682 F. App'x 256, 259 n.3 (5th Cir. 2017) (per curiam) (discussing, though not deciding, the proper standard of review).

[7] *See Claimant ID 100081155*, 920 F.3d at 928 (applying the same reasoning).

[8] *Adams Produce*, 682 F. App'x at 257.

asset transfer agreement transferred only certain assets and liabilities; the LLC continued to operate "Adams Produce," which had previously been operated by the corporation.[9] The Appeal Panel allowed the LLC to file a claim based on the continued operation of the "Adams Produce" business enterprise—even though the LLC had not operated prior to the oil spill.[10] The district court reversed, reasoning that the LLC could not rely on the corporation's pre-spill operation of the underlying "Adams Produce" business because the transaction had involved a transfer of assets, not merely a sale of the corporation's stock or a change in corporate organization.[11] In sum, "[t]he transaction was something other than a single entity merely changing its legal form of organization; it was a sale of assets from one entity to a separate entity with a different set of owners."[12]

We affirmed, holding that "[t]he Settlement Agreement makes clear that, under these circumstances, [the LLC] is the proper business claimant, not the underlying food business that [the LLC] operated."[13] Although the LLC had received "substantially all" of the corporation's assets and liabilities and continued to operate the underlying food business, it was a distinct entity from the corporation, and they could not "combine to form one business claimant with one [Business Economic Loss] claim."[14] In particular, we emphasized the nature of the transaction—an asset transfer agreement, rather than a stock purchase.[15]

---

[9] *Id.*

[10] *Id.* at 257–58.

[11] *Id.* at 258 n.2.

[12] *Id.*

[13] *Id.* at 260.

[14] *Id.* at 260–61.

[15] *See id.*

*Adams Produce* closely tracked our earlier decision in *Claimant ID 100009540 v. BP Exploration and Production, Inc.* (*ARTCC*), which involved an oyster-processing business, Bayou Oyster, that was originally owned by Crab Connection, LLC.[16] ARTCC purchased Bayou Oyster's assets from Crab Connection in 2009, leaving Crab Connection responsible for Bayou Oyster's liabilities.[17] The Claims Administrator and Appeal Panel rejected ARTCC's efforts to be classified as a preexisting entity rather than a start-up at the time of the spill.[18] We affirmed the district court's denial of discretionary review, reasoning that the Settlement "makes clear that the proper claimant is the 'entity' asserting a business economic damages claim, and not . . . the *business* (here, Bayou Oyster), that is operated by that entity."[19] Here too, we noted the fact that the assets were transferred by an asset sale: "[i]t is well-established that the life of an entity *continues* in a stock sale, whereas assets are transferred to a *different* entity in an asset sale."[20] Because ARTCC was a distinct entity, the Claims Administrator correctly treated it as a failed start-up.

As in *Adams Produce* and *ARTCC*, Claimant and SHG entered into an asset purchase agreement—rather than a stock sale—transferring assets and liabilities from SHG to an entity with a different ownership makeup. While Claimant heavily emphasizes the fact that the underlying "Dattoli Cancer Center and Brachytherapy Business" has continued uninterrupted, this was true of the underlying businesses in *Adams Produce* and *ARTCC* as well. Claimant also attempts to distinguish *Adams Produce* and *ARTCC* by arguing that in both of those cases, the asset purchase agreements at issue did not

---

[16] 680 F. App'x 263, 264 (5th Cir. 2017) (per curiam).
[17] *Id.*
[18] *Id.*
[19] *Id.* at 267.
[20] *Id.* at 267–68.

effect a *complete* transfer of both assets and liabilities to the new entities, whereas the agreement between SHG and Claimant did. Putting aside the parties' disagreement on this point,[21] even if the agreement between SHG and Claimant transferred all of SHG's assets and liabilities to Claimant, this does not render *Adams Produce* and *ARTCC* irrelevant. Both recognized that *the entity asserting the claim* is what matters for the purposes of claim classification, not the underlying business.[22] Here, as the district court held, Claimant is a distinct entity from SHG—at a minimum, Claimant's ownership differs from SHG's ownership because Claimant is solely owned by Dr. Dattoli, whereas SHG was owned by Dattoli and Kaltenbach at the time of the sale. Claimant does not dispute that SHG continued to exist and hold assets after Claimant's formation, corroborating the conclusion that these are separate legal entities and not just a reorganization. Under these facts, the district court did not err in holding that the Start-Up Business framework properly applied.

## B

Claimant's other arguments are unavailing. While Claimant points to district court opinions that it believes support its argument, those opinions do not control our decision—and in any event, they do not conflict with the principles we have described.[23] To the extent that Claimant argues more

---

[21] As we have discussed, BP argues that the asset purchase agreement did not transfer *all* liabilities from SHG to Claimant, while Claimant argues that as a practical matter, it received all of SHG's assets and liabilities.

[22] *See Adams Produce*, 682 F. App'x at 260–61; *ARTCC*, 680 F. App'x at 267–68.

[23] In one, the district court held that the Appeal Panel incorrectly excluded evidence of operations and financial history of a claimant's predecessor, where the two entities "are essentially the same business that merely went through a re-organization and incorporation with a new name and a new employer identification number in 2010." For the reasons we have explained, Claimant in this case has not shown that the asset transfer between SHG and Claimant was the equivalent of a re-organization of the existing SHG business. In another, an entity that was previously entirely owned by one person was effectively replaced by a parallel entity that included the person's wife as a 50% owner. In this case, the district court emphasized that there was no familial relationship between SHG's other owners and

generally that the district court failed to account for the "totality of the circumstances" in making its determination, we disagree. Rather, *Adams Produce* and *ARTCC* both recognized that even where an underlying business operation continues essentially unchanged under the ownership of two different entities, an asset purchase agreement that transfers the first entity's assets and liabilities to one with different ownership indicates that the claimant is a distinct entity from its predecessor—one not entitled to marshal the business records of the predecessor in seeking compensation under the Settlement.[24]

## IV

We affirm the judgment of the district court.

---

Claimant's sole owner—so, to the extent that a familial relationship between former and current owners might affect our inquiry, it does not apply here.

[24] Claimant waived its argument that the Claims Administrator's decision contravened established principles of maritime law on business continuity due to failure to raise this issue before the Appeal Panel and the district court. Further, we essentially rejected this argument in *ARTCC*, where we observed that doctrine involving the "mere continuation" exception to the rule of non-liability in a tort context is intended "to prevent two corporations from merging in effect while limiting the liability of the surviving corporation by structuring the transaction as a sale of assets," which "has no relevance . . . where [a claimant] is seeking solely to step into the shoes of [another entity] in order to claim a benefit to which it would otherwise not be entitled." *ARTCC*, 680 F. App'x at 268. Contrary to Claimant's argument, this did not hinge on a distinction between Louisiana law and maritime law, but rather on the irrelevancy of the "mere continuation" doctrine to a case like this one.